UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

METLIFE SECURITIES, INC.,          )
METLIFE INSURANCE COMPANY USA,     )
METLIFE INVESTORS DISTRIBUTION     )
COMPANY, METROPOLITAN LIFE         )
INSURANCE COMPANY AND              )
METLIFE, INC.,                     )
                                   )
          Petitioners,             )
                                   )
v.                                 )          No. 2:16-CV-32
                                   )
PATSY A. HOLT,                     )
                                   )
          Respondent.              )

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on Petitioners' Petition for Order to Compel
Arbitration [doc. 1], Respondent's Motion to Dismiss, or in the Alternative, Motion for
Summary Judgment [doc. 4], Respondent's Brief in Support of the Motion [doc. 5], and
Petitioners' Response in Opposition to the Motion [doc. 6]. For the reasons herein, the
Court will grant in part Petitioner's motion and deny Respondent's motion.

## I.    BACKGROUND

Respondent Patsy A. Holt ("Ms. Holt") opened several Individual Retirement
Accounts with Petitioners ("MetLife") in Greeneville, Tennessee, four of which are at issue
in this action. [Pet. to Compel Arbitration ¶¶ 1, 52; Holt Dep., doc. 1-9, at 8:4–8, 21–23,

9:17–20, 10:15–25, 11:1–3, 14:4–14; Woods Decl., doc. 4-1, ¶ 5].[1] Ms. Holt personally signed the account application for one of the four accounts—account number XXXXX9324. [Holt Dep. at 14:4–17]. At the suggestion of MetLife's authorized representative in charge of the accounts, Mark Salyer ("Mr. Salyer"), Ms. Holt instructed her daughter, Lydia Salyer ("Ms. Salyer"), to sign the account applications for the three other accounts—account numbers XXXXX3828, XXXXX9931, and XXXXX8578—on her behalf. [*Id.* at 5:23–25, 6:1, 7:22–25, 8:1–25, 9:1–16, 10:15–25, 11:1–13].[2] Ms. Holt's name, Patsy A. Holt, appears in cursive in the signature block on those three account applications, [*see* Account Application 3828, doc. 1-2, at 2; Account Application 9931, doc. 1-3, at 2; Account Application 8578, doc. 1-4, at 2], but Ms. Holt did not view or read them, [Holt Dep. at 11:14–18]. In total, Ms. Holt claims to have invested more than $1,900,000 in the accounts. [Second Am. Compl., doc. 1-8, ¶ 19].

According to Ms. Holt, Mr. Salyer went on to misappropriate her funds, which are now almost entirely gone. [*Id.* ¶¶ 28, 30]. As a result, she sued Mr. Salyer and MetLife in the Circuit Court of Sullivan County, Tennessee, for breach of contract, conversion, failure to supervise, fraud, and negligence, alleging that MetLife is responsible for Mr. Salyer's misconduct. [*Id.* ¶¶ 25–35]. In response, MetLife filed in the state court a motion to compel arbitration, arguing that Ms. Holt has to arbitrate her claims because the four account applications contain arbitration provisions. [*See* Pet. to Compel Arbitration ¶ 9; State Court

---

[1] Pincites to the record refer to the electronic page numbers.
[2] MetLife alleges that Mr. Salyer "was Holt's son-in-law at the time." [Pet. to Compel Arbitration ¶ 1].

2

Order, doc. 7-2, ¶ 2]. In each account application, the arbitration provision reads:

> MetLife. . . and the purchaser of the shares, who is the signatory below . . . agree that any controversy . . . arising out of or relating to any transactions between [them] shall be determined by arbitration. . . . This agreement and any arbitration hereunder shall be governed and construed in accordance with the laws of the State of New York . . . .

[Account Applications, doc. nos. 1-1, 1-2, 1-3, 1-4, at 3]. The court ruled that Ms. Holt's claims related to account number XXXXX9324 are subject to arbitration but reserved ruling on the arbitrability of the other claims until it could decide whether to allow discovery. [Woods Decl. ¶ 5]. Mr. Salyer, however, then filed for bankruptcy, and the court stayed the case for roughly three years. [Pet. to Compel Arbitration ¶ 9]. When the case resumed after the bankruptcy proceedings, the court permitted Ms. Holt to file a revised second amended complaint so she could allege that the arbitration provisions are unenforceable contracts of adhesion. [Woods Decl. ¶ 8; *see* Second Am. Compl. ¶ 22].

Around this same time, Ms. Holt claims that she and MetLife agreed to "a methodology" to resolve the case. [Woods Decl. ¶ 9]. According to Ms. Holt, the parties decided, in a series of e-mails, "to pursue a ruling from the state court judge on the issue of arbitration and then irrespective of who prevailed, they would mediate the underlying suit within sixty (60) days for the ruling." [*Id.*]. In pertinent part, the e-mails read:

- Ms. Holt's counsel: "[We] would propose . . . mediat[ion] within 90 days so as to allow for mutual discovery in the Holt matter pursuant to an agreed scheduling Order." [E-mail 1, doc. 7-1, at 1].

- MetLife's counsel: "MetLife is agreeable to mediating Holt within 90 days of the court's ruling on the arbitration issue. . . . I don't know of any reason we couldn't have a hearing on the [arbitration] issue in the next 30-45 days and get a final decision from [the state court]. Please let me know if that is acceptable." [E-mail 2, doc. 7-1, at 1].

- Ms. Holt's counsel: "Holt will be okay if we shorten it up to 60 days." [E-mail 3, doc. 7, at 2].

- MetLife's counsel: "[Y]ou never directly responded to the shortening on Holt from 90 days to 60 days. You are agreeable to the sixty days, are you not?" [E-mail 4, doc. 7-1, at 2].

- Ms. Holt's counsel: "[W]e're ok with the 60 days." [E-mail 5, doc. 7-1, at 2].

After exchanging these e-mails, MetLife renewed its motion to compel arbitration, prompting the state court to allow discovery on whether all four arbitration provisions are unenforceable contracts of adhesion. [State Court Order at 2]. The state court reserved ruling on this issue until it could conduct an evidentiary hearing. [*Id.*]. Since then, the parties have conducted some discovery—including depositions, interrogatories, and requests for production. [Woods Decl. ¶ 12].

MetLife now petitions this Court to compel Ms. Holt to arbitrate her claims, seeking this recourse under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–14. [Pet. to Compel Arbitration at 5–16].[3] Ms. Holt argues that the Court should not compel arbitration because the doctrine of abstention prevents it from exercising jurisdiction while the parallel suit is pending in state court. [Resp't's Br. at 5–10]. Ms. Holt also contends that, in the e-mails between the parties, MetLife waived its contractual right to arbitrate and agreed to a legally

---

[3] MetLife seeks to compel arbitration under 9 U.S.C. § 4, which reads: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which . . . would have jurisdiction . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." MetLife, however, has not requested that the Court enjoin the state-court proceedings. *See* 28 U.S.C. § 2283; *Great Earth Cos. v. Simons*, 288 F.3d 878, 894 (6th Cir. 2002).

binding forum-selection provision that requires the parties to remain in state court. [*Id.* at 4–5].

## II. THE FEDERAL ARBITRATION ACT

Under the FAA, "a district court's consideration of a motion to compel arbitration is limited to determining whether the parties entered into a valid agreement to arbitrate." *Burden v. Check into Cash of Ky., LLC*, 267 F.3d 483, 487 (6th Cir. 2001) (citation omitted).[4] The FAA states that an arbitration provision in a commercial contract[5] is "valid, irrevocable, and enforceable" except on "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In other words, inherent in the FAA's language is a "strong federal policy in favor of arbitration," *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citations omitted), which requires courts to abide by the "well-established

---

[4] Although the Sixth Circuit has expressed that a "district court's consideration of a motion to compel arbitration is limited to determining whether the parties entered into a valid agreement to arbitrate," *Burden*, 267 F.3d at 487, it has also recognized that a district court must make three other "threshold determinations before compelling arbitration," *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003). They include a determination of the arbitration agreement's scope, a determination of whether Congress intended any federal statutory claims in the suit to be nonarbitrable, and a determination of whether to stay the proceedings if some but not all of the claims require arbitration. *Id.* In the current case, the parties quarrel over only whether each arbitration provision is a valid one. They do not dispute that Ms. Holt's claims fall within the scope of the arbitration provisions; they do not raise federal statutory claims; and a stay is unnecessary because the merits of Ms. Holt's underlying claims are not before the Court. The Court will therefore limit its analysis to whether the parties have entered into valid arbitration provisions. *See Brookdale Senior Living Inc. v. Stacy*, 27 F. Supp. 3d 776, 787 (E.D. Ky. 2014) (excluding three of the threshold determination from its analysis because the parties "only contest[ed] . . . whether [they] entered into a valid arbitration agreement").

[5] The parties do not dispute that each account application is a commercial contract, or "a contract evidencing a transaction involving commerce," which is a prerequisite to the FAA's applicability. 9 U.S.C. § 2; *see Grant v. Houser*, 469 F. App'x 310, 313 (5th Cir. 2012) (determining that a "New Account Form," which a party had signed to open a securities brokerage account, "constitute[s] interstate commerce under the FAA, because the sale of securities has a substantial effect on interstate commerce" (citation omitted)).

5

rule that any doubts regarding arbitrarily should be resolved in favor of arbitration," *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). This federal policy, however, is "not an absolute one" because any agreement to arbitrate remains "a matter of consent, not coercion." *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)); *see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.").

### A. Federal Jurisdiction under the FAA

Although MetLife seeks to compel arbitration under the FAA, its petition alone is insufficient to create subject matter jurisdiction:

> The [FAA] is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 . . . or otherwise.

*Moses H. Cone*, 460 U.S. at 25 n.32. An independent jurisdictional basis is therefore a prerequisite to a federal court's ability to review a petition to compel arbitration. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008). A federal court has an independent jurisdictional basis over a petition to compel arbitration if it would have jurisdiction over the "suit arising out of the controversy between the parties." 9 U.S.C. § 4; *see Moses H. Cone*, 460 U.S. at 25 n.32 (stating that the FAA permits a federal court to consider a petition under the FAA "only when [it] would have jurisdiction over a suit on

6

the underlying dispute" and "hence, there must be diversity of citizenship or some other

independent basis for federal jurisdiction").

MetLife asserts that this Court has an independent basis for jurisdiction over the

underlying state-court action based on diversity of citizenship jurisdiction, [Pet. to Compel

Arbitration at 5–9], the existence of which Ms. Holt does not appear to refute but to accept,

[*see* Woods Decl. ¶ 7]. The parties, however, cannot create subject matter jurisdiction

simply by consenting to it, *see Tatum v. Mathews*, 541 F.2d 161, 163 n.1 (6th Cir. 1976)

(reviewing the action for subject matter jurisdiction even though a party had consented to

it), and "it is of course proper, and indeed mandatory for a court to inquire into its subject-

matter jurisdiction" to ensure that parties have not "confer[ed] . . . subject-matter

jurisdiction" upon it, *Rauch v. Day & Night Mfg., Corp.*, 576 F.2d 697, 699 & n.1 (6th Cir.

1978). The Court will therefore perform a *sua sponte* review of MetLife's petition to

confirm that it meets the requirements of subject matter jurisdiction. *Id.* at 699 (stating that

subject matter jurisdiction "may always be reached by the court sua sponte" (footnote

omitted)).[6]

A federal court is able to exercise diversity jurisdiction over an action only if no

plaintiff and no defendant are citizens of the same state and the amount in controversy is

more than $75,000 exclusive of interest and costs. 28 U.S.C. § 1332(a). The party seeking

the federal forum "has the burden of pleading sufficient facts to support the existence of

the court's jurisdiction," *Vaughn v. Holiday Inn Cleveland Coliseum*, 56 F. App'x 249, 250

---

[6] The federal courts, incidentally, do not have liberty to conduct a *sua sponte* review of
personal jurisdiction, which is an issue that the parties must raise. *Rauch*, 576 F.2d at 701.

(6th Cir. 2003) (citing Fed. R. Civ. P. 8), including "all parties' citizenships such that . . . complete diversity can be confirmed," *id.* When a party to a suit is a corporation, the pleading must contain both the corporation's place of incorporation and its principal place of business, *id.*, each of which constitutes a state of citizenship for the corporation, 28 U.S.C. § 1332(c)(1).

As to the amount-in-controversy requirement, courts have addressed it specifically in the context of a petition to compel arbitration and determined that an allegations as to the amount in controversy must satisfy the "legal certainty" standard. *Woodmen of the World/Omaha Woodmen Life Ins. Soc'y v. Scarbro*, 129 F. App'x 194, 196 (6th Cir. 2005); *e.g.*, *Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1107 (9th Cir. 2010); *Doctor's Assocs., Inc. v. Hamilton*, 150 F.3d 157, 160–61 (2d Cir. 1998). Under the legal certainty standard, a party's good-faith allegation that the amount in controversy exceeds $75,000 is sufficient unless "it is obvious that the suit cannot involve [that] amount" based on the pleading's face. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 292 (1938). When applying the legal certainty standard to a petition to compel arbitration, "the court should take into consideration the value of the underlying state court litigation." *Woodmen of the World*, 129 F. App'x at 196.

After a *sua sponte* review of MetLife's petition, the Court is satisfied that it has diversity jurisdiction over the underlying state-court dispute between the parties. MetLife meets its burden by alleging both the place of incorporation and the principal place of business of each corporation that is a plaintiff in the state-court action, and now a petitioner in this action. [*See* Pet. to Compel Arbitration at 6]. Because MetLife alleges that none of

8

these corporations is a citizen of Tennessee, where Ms. Holt is a citizen according to MetLife, the parties have complete diversity. [*Id.*]. MetLife also satisfies the amount-in-controversy requirement by reciting figures from the state-court action, including Ms. Holt's alleged loss of more than $1,900,000 and settlement demand of $3,000,000. [*Id.* at 7–8]; *see Shupe v. Asplundh Tree Expert Co.*, 566 F. App'x 476, 480–81 (6th Cir. 2014) (recognizing that a "settlement demand letter is '*some* evidence' regarding the amount in controversy." (quotation omitted)). Based on these figures, "it is [not] obvious that the suit cannot involve [an] amount" over $75,000, and the Court therefore has subject matter jurisdiction over it. *Red Cab*, 303 U.S. at 292.

## B. Abstention

Although the Court has subject matter jurisdiction over the state-court dispute—and by extension, over MetLife's petition to compel arbitration—Ms. Holt argues that it should not exercise its jurisdiction based on the doctrine of abstention. "In certain 'exceptional' circumstances . . . a federal district may abstain from exercising its subject matter jurisdiction due to the existence of a concurrent state court proceeding, based on 'considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). Abstention, however, "is the exception, not the rule" and is appropriate only when it "would clearly serve an important countervailing interest." *Colo. River*, 424 U.S. at 813 (quotation omitted).

A federal court must therefore engage in "a careful balancing of the important factors

9

as they apply in a given case, with the balance *heavily weighted in favor of the exercise of jurisdiction.*" *Moses H. Cone*, 460 U.S. at 16. (emphasis added). These factors include (1) "whether the state court has assumed jurisdiction over any res or property," (2) "whether the federal forum is less convenient to the parties," (3) "avoidance of piecemeal litigation," (4) "the order in which jurisdiction was obtained," (5) "whether the source of governing law is state or federal," (6) "the adequacy of the state court action to protect the federal plaintiff's rights," (7) "the relative progress of the state and federal proceedings," and (8) "the presence or absence of concurrent jurisdiction." *PaineWebber*, 276 F.3d at 206 (quotation omitted). Ms. Holt concedes that half of these factors—the first factor, the second factor, the sixth factor, and the eighth factor—do not weigh in favor of abstention. [*See* Resp't's Br. at 6–7]. The Court's analysis, however, does not end with this concession because the remaining factors, if strong enough, can make this case an exceptional circumstance that requires abstention. *See Moses H. Cone*, 460 U.S. at 16 (stating that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case").

The "most important" factor is the third factor, which centers on "whether there is a 'clear federal policy evinc[ing] . . . the avoidance of piecemeal adjudication' found within the statutory scheme at issue." *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 467 (6th Cir. 2009) (quoting *Colo. River*, 424 U.S. at 819). "In the case of the Federal Arbitration Act, there most clearly is not such a policy" because it "requires district courts to compel arbitration . . . when one of the parties files a motion to compel,

10

*even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.*" *Id.* at 467–68 (emphasis added) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985)); *see Moses H. Cone*, 460 U.S. at 20 (stating that the FAA "*requires* piecemeal resolution when necessary to give effect to an arbitration agreement," regardless of whether "other persons who are parties to the underlying dispute" are "forced to resolve . . . related disputes in different forums"). The most important factor in this Court's analysis therefore remains "heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16.

The fifth factor, whether the source of governing law is state or federal, also does not support abstention because, importantly, "the FAA provides the source of law for interpreting the arbitration [provisions]." *PaineWebber*, 276 F.3d at 208. Ms. Holt argues that the fifth factor favors abstention because the "sole issue is a question of Tennessee law, i.e., whether or not the arbitration provisions are unconscionable and thus unenforceable contracts," [Resp't's Br. at 7],[7] but this issue is not the "sole issue" before the Court. Rather, it is one offshoot of the main and broader issue: whether Ms. Holt must arbitrate her claims. When the basic issue in a case, like this one, is "the arbitrability of the dispute," federal law governs that issue even if it arises in state court. *Moses H. Cone*, 460 U.S. at 24. Because the FAA is at the heart of the parties' dispute, the fifth factor cuts against abstention, despite the coexistence of both state and federal questions. *See id.* at 24,

---

[7] Ms. Holt makes this assertion without addressing the plain language of the arbitration provisions, which state that they "shall be governed and construed in accordance with the laws of the State of New York." [Account Applications at 3].

26 ("The effect of the [FAA] is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement . . . . [and] the presence of federal-law issues must always be a major consideration weighing against surrender.").

As to the remaining factors—the fourth and seventh factors—they do favor abstention but only marginally. Although the state court assumed jurisdiction several years ahead of this Court, the case there has been slow-moving. *See id.* at 22 (stating that "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions"). MetLife filed its initial motion to compel arbitration in state court nearly seven years ago, and since then, the three-year stay in the case, as well as discovery disputes, [*see* Woods Decl. ¶ 12], have caused that motion to languish. According to MetLife, "[t]he state court proceedings have not progressed beyond the pleadings stage," [Pet. to Compel Arbitration ¶ 9]—an assertion that is consistent with the record, which shows that discovery has reached an impasse, [*see* Woods Decl. ¶ 12; State Court Order at 2].

To date, the state court appears not yet to have decided the issue of whether any of the arbitration provisions are unenforceable contracts of adhesion or are valid arbitration provisions that require Ms. Holt to arbitrate her claims. [*See* Woods Decl. ¶ 14; State Court Order at 2]. Although Ms. Holt insists that "[t]he state court action is on the verge of a final hearing on the issue of arbitration," [Resp't's Br. at 7], this Court, which has received extensive briefing as well as evidentiary submissions from both parties, is itself now equally as capable as the state court to "completely resolve[] the issue of arbirability," *Great Earth Cos. v. Simons*, 288 F.3d 878, 887 (6th Cir. 2002). In fact, this Court's failure

to do so—particularly in light of the multiyear delay in the state-court proceedings—would likely contravene "Congress's clear intent" in the FAA "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone*, 460 U.S. at 22. Because "there is no indication that any significant proceedings have taken place in the state court," the fourth factor, under which the state court obtained jurisdiction before this Court, wanes in significance. *Great Earth*, 288 F.3d at 887. In sum, all the factors together remain "heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone*, 460 U.S. at 16, and this case therefore lacks exceptional circumstances that oblige the Court to cede its jurisdiction, *see id.* at 25–26.

## III. ANALYSIS

Having concluded that abstention is not appropriate, the Court will decide whether the parties entered into a valid arbitration agreement for each account. MetLife contends that Ms. Holt agreed to arbitrate her claims because she signed one of the arbitration provisions and instructed Ms. Salyer, who acted as her agent, to sign the other arbitration provisions on her behalf. [Pet. to Compel Arbitration at 11–15]. Ms. Holt maintains, however, that MetLife waived its right to compel arbitration under the FAA in the e-mails between the parties and agreed to a legally binding forum-selection provision that requires the parties to litigate in state court. [Resp't's Br. at 4–5].

Ms. Holt has also argued in state court that the arbitration provisions are not valid because they are unenforceable contracts of adhesion. [*Id.* at 2; Woods Decl. ¶ 8]. Although she does not reassert this argument before this Court, it is her lone remaining argument at the state level, and she mentions it in passing in the documents that she filed in this action.

13

[*See id.*]. The Court will therefore consider her argument. *Cf. CIGNA HealthCare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 854 (7th Cir. 2002) (explaining that the FAA "requires both federal and state courts to apply a federal common law . . . applicable equally in federal and state courts" (internal citations omitted)).

## A. Legal Standard

"When asked by a party to compel arbitration under a contract, a federal court must determine whether the parties have agreed to arbitrate the dispute at issue." *Stout*, 228 F.3d at 714 (citation omitted). If a court concludes that an arbitration agreement is valid, it must order the parties to arbitration. 9 U.S.C. § 4; *Great Earth*, 288 F.3d at 889. If it determines, however, that the validity of the arbitration agreement is "in issue," 9 U.S.C. § 4, the parties must then proceed to a trial to resolve their dispute, *Great Earth*, 288 F.3d at 889. A trial is necessary only if the party opposing arbitration shows a genuine issue of material fact as to the arbitration agreement's validity. *Id.* at 889; *see Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (stating that the party challenging arbitration has the burden of proving that the claims at issue are not arbitrable). "The required showing mirrors that required to withstand summary judgment in a civil suit." *Great Earth*, 288 F.3d at 889 (citing *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 129–30 (2d Cir. 1997), *cert. denied*, 522 U.S. 948 (1997))).

The inquiry, therefore, that a court should make is whether the evidence "is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Id.* (citation omitted). When making this inquiry, a court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party—that is, the party

seeking to avoid arbitration. *Id.* In arguing that the arbitration provisions are unenforceable contracts of adhesion, Ms. Holt contests the validity or enforceability of the arbitration provisions. *See Seawright v. Am. Gen. Fin. Servs, Inc.*, 507 F.3d 967, 975–77 (6th Cir. 2007) (viewing an argument that an arbitration agreement was an unenforceable contract of adhesion as one going to the validity or enforceability of the arbitration agreement). The Court will therefore apply a standard to this argument that "mirrors that required to withstand summary judgment." *Great Earth*, 288 F.3d at 889 (citation omitted).

Ms. Holt's second argument—that MetLife waived its right to arbitration—does not appear to warrant this precise standard, however, because it is not an argument that places the validity or enforceability of the arbitration provisions "in issue." 9 U.S.C. § 4. Rather, it is an argument that MetLife—through its conduct in litigation—acted in a way that divests it of its right to arbitrate. *See JPD, Inc., v. Chronimed Holdings, Inc.*, 539 F.3d 388, 394 (6th Cir. 2008) (describing waiver by conduct as "conduct inconsistent with reliance on an arbitration agreement" and that precludes a party from seeking "an arbitration referral"). Indeed, several courts have treated waiver by conduct not as an argument pertaining to the validity or enforceability of an arbitration provision but as a defense to a motion to compel arbitration. *See, e.g.*, *Khan v. Parsons Global Servs., Ltd.*, 521 F.3d 421, 424–25 (D.C. Cir. 2008); *In re Tyco Int'l Ltd Secs. Litig.*, 422 F.3d 41, 44 (1st Cir. 2005); *PPG Indus, Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 107 (2d Cir. 1997); *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 232 (3d Cir. 1997).

Rather than assume that Ms. Holt, to prevail on her argument of waiver by conduct, must vault a hurdle as high as one on summary judgment, the Court will identify her burden

based on how she has casted her motion and the evidence that she has filed to support it. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006) ("[T]he mere presentation of evidence outside of the pleadings, absent the district court's rejection of such evidence, is sufficient to trigger the conversion of a Rule 12(c) motion to a motion for summary judgment" (citation omitted)); *cf. Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 718 (6th Cir. 2012) (applying the Federal Rules of Civil Procedure to a motion to compel arbitration).

Because Ms. Holt framed her motion as a motion to dismiss, or alternatively, a motion for summary judgment, [Resp't's. Br. at 1], and submitted evidence to support her motion—the Declaration of Ronald W. Woods—the Court will apply the standard for summary judgment to her argument of waiver. *See* Fed. R. Civ. P. 12(d); *see also Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013) (stating that the summary judgment standard is appropriate when a non-movant presents "more than a 'naked assertion . . . that it did not intend to be bound' by the arbitration agreement" (quotation omitted)). In doing so, the Court will conduct its analysis while keeping in mind the robust federal policy in favor of the enforcement of arbitration agreements. *See Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986) (noting that "[a]ny examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements" (citing *Moses H. Cone*, 460 U.S. at 24–25)).

Summary judgment is appropriate when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's case," *id.* at 325, at which point the nonmoving party, to withstand summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party," *id.* In short, the inquiry is whether the evidence "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In ruling on a motion for summary judgment, a court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

17

## B. Applicable Law

When exercising diversity jurisdiction, a federal court applies the substantive law of the forum state, or the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012). In an action involving the FAA, however, if parties have consented to another state's substantive law in their arbitration agreement, that law will govern their dispute, so long as it does not undermine the goals and policies of the FAA. *See Hall St. Assocs.*, 552 U.S. at 586 (noting that "the FAA lets parties tailor some, even many . . . features of arbitration by contract, including the . . . choice of substantive law"); *Volt*, 489 U.S. at 479 (observing that "the FAA's primary purpose [is to] ensur[e] that private agreements to arbitrate are enforced according to their terms"); *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991) (determining that the FAA required parties in a diversity action to resolve their dispute under New York law because they consented to that law in their arbitration agreement); *see also* 9 U.S.C. § 4 (allowing a party to request that arbitration "proceed *in the manner provided for in [the arbitration] agreement*" (emphasis added)); *but see Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.").

In this case, the parties agreed that the arbitration provisions "shall be governed and construed in accordance with the laws of the State of New York." [Account Applications at 3]. Ms. Holt does not dispute that her claims fall within the scope of the arbitration provisions—that is, that her claims are "controvers[ies] . . . arising out of or relating to any

18

transaction between [the] parties" that "shall be determined by arbitration." [*Id.*]. Rather, the issue that she brings before the Court is whether the arbitration provisions are invalid because they are unenforceable contracts of adhesion. [Resp't's Br. at 2; Woods Decl. ¶ 8]. "[A]s with any other contract, the parties' intentions control," *Mitsubishi Motors*, 473 U.S. at 626, and the Court will therefore apply substantive New York law in determining whether the arbitration provisions are valid or are unenforceable contracts of adhesion, *see Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (reading a choice-of-law provision that required application of "the laws of the State of New York" as "encompass[ing] substantive principles that New York courts would apply"); *see also Barbier*, 948 F.2d at 122 ("[T]he language of the parties' Agreement is clear: 'This agreement shall . . . be governed by the laws of the State of New York.'").

In contrast, the issue of waiver does not fall within the scope of the arbitration provisions because waiver, when it occurs through a party's conduct, is not an arbitrable matter but one that a court "presumptively evaluates." *JPD, Inc.*, 539 F.3d at 393 (citations omitted).[8] Without a choice-of-law provision that governs the issue of waiver by conduct, the Court has to decide which law to apply to this issue—federal law or applicable state law based on the Court's diversity jurisdiction. In addressing waiver of the right to

---

[8] The Court also notes that the arbitration provisions in this case are silent on the issue of waiver by conduct. *See generally E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 n.9 (2002) (noting that the FAA "does not expand the range of claims subject to arbitration beyond what is provided for in the agreement"); *Volt*, 489 U.S. at 474 (stating that the FAA permits a party to request that "arbitration proceed *in the manner provided for in [the parties'] agreement*," not "to compel arbitration of any dispute at any time" (internal quotation marks and quotation omitted)); *but see Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.*, 706 F.2d 155, 160 (6th Cir. 1983) (explaining that when an arbitration provision is "extremely broad" any attempt to "limit arbitrability must be scrutinized with care").

19

arbitrate, the Sixth Circuit has consistently applied federal law rather than state law. *See, e.g., Dantz v. Am. Apple Grp., LLC*, 123 F. App'x 702, 707–08 (6th Cir. 2005); *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 573–74 (6th Cir. 2003); *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 355–59 (6th Cir. 2003); *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 438 (6th Cir. 2002); *see also Stratton v. Portfolio Recovery Assocs., LLC*, No. 5:13-147-DCR, 2015 WL 6675551, at *4–5 (E.D. Ky. Nov. 2, 2015) (applying federal law to an issue of waiver when the arbitration agreement contained no mention of the parties' right to waive arbitration). On one occasion, the Sixth Circuit did apply state law to an issuer of waiver in a diversity action, but the arbitration agreement contained a choice-of-law provision and the parties did not argue that the district court had erred by using state law. *WorldSource Coil Coating, Inc. v. McGraw Constr. Co.*, 946 F.2d 473, 477–80 (6th Cir. 1991).

In addition, this Court questions whether the *Erie* doctrine can apply to cases under the FAA. In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967), the Supreme Court rejected an argument that federal courts remain bound by *Erie* in FAA actions that are before them "solely by reason of diversity of citizenship," because the FAA "is based upon and confined to incontestable federal foundations" of control under the Commerce Clause. *Id.* at 404–05. In *Perry v. Thomas*, the Court reiterated this point:

> [In *Prima Paint*], [t]he Court dismissed the argument that the asserted right to judicial resolution adhered in state substantive law which a federal court sitting in diversity was bound to follow under the rule of *Erie R. Co. v. Tompkins*. It reasoned instead that Congress had enacted the substantive provisions of the [FAA] pursuant, in part, to its constitutional power to regulate interstate commerce, a distinction which endows these provisions with pre-emptive force under the Supremacy Clause.

482 U.S. at 491 n.8 (internal citations omitted); *see also Fahnestock & Co. v. Waltman*,

935 F.2d 512, 520 (2d Cir. 1991) (Mahoney, J., concurring in part and dissenting in part)

("The *Erie* standard is intended . . . for 'all matters except those in which some federal law

is controlling.' It therefore seems to me clearly inappropriate to apply *Erie*-generated rules

to [cases under the FAA because] the Supreme Court has instructed[] federal law supplies

the rule of decision." (quotation omitted)). Based on these cases, the Court will apply

federal law to the issue of waiver by conduct in this action.

### C. Waiver of the Right to Arbitrate

"[P]arties to an arbitration agreement can always waive the agreement and decide

to duke out their dispute in court," *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*,

575 F.3d 693, 695 (7th Cir. 2009) (citations omitted)); *see Johnson Assocs.*, 680 F.3d at

717—which is what Ms. Holt claims that MetLife has done in this case. Ms. Holt argues

that MetLife's waiver of the right to arbitrate arose through the parties' e-mails and that

these e-mails constitute a binding forum-selection agreement that requires the parties to

litigate in state court. [Resp't's Br. at 4–5]. Ms. Holt also claims that the e-mails, at a

minimum, "established mediation as a prerequisite . . . to . . . arbitration of the underlying

case." [*Id.* at 4]. In this vein, Ms. Holt argues that MetLife, by filing its federal petition,

has "shirk[ed] its contractual obligations under the agreement," [*id.* at 5]—a point that she

reiterates in her affidavit with the Court, [*see* Woods Decl. ¶ 15]. MetLife, however, refutes

Ms. Holt's assertions in its own affidavit, stating that it "never . . . agreed to designate

Tennessee state court as the exclusive forum," that it "did not agree . . . to forgo filing an

arbitration petition under . . . the [FAA] in federal court," and that the e-mails only "dealt with the timing of a potential mediation." [Range, Jr. Aff., doc. 6-1, ¶¶ 5–6, 10].

In this circuit, a party may waive a contractual right to arbitrate by "(1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; and (2) 'delaying its assertion to such an extent that the opposing party incurs actual prejudice.'" *Johnson Assocs.*, 680 F.3d at 717 (quotation omitted). "[W]aiver of the right to arbitration is not to be lightly inferred," *O.J. Distrib.*, 340 F.3d at 355–56 (quotation omitted), and therefore "[t]he strong presumption in favor of arbitration works against finding waiver in cases other than those with the most compelling fact patterns," *JPD, Inc.*, 539 F.3d at 393 (citation omitted); *see MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 250 (4th Cir. 2001) ("The party opposing arbitration 'bears the heavy burden of proving waiver.'" (quotation omitted)); *Snap-on Tools Corp. v. Mason*, 18 F.3d 1261, 1267 (5th Cir. 1994) ("[We] place[] a 'heavy burden' on a party claiming waiver of arbitration rights." (quotation omitted)); *but see Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995) ("In determining whether a waiver has occurred, the court is not to place its thumb on the scales; the federal policy favoring arbitration is . . . merely a policy of treating such clauses no less hospitably than other contractual provisions.").

The parties' competing affidavits raise a factual dispute as to whether MetLife intended to waive its right to arbitration and create a forum-selection provision—but it is not a material factual dispute, even if the Court accepts Ms. Holt's argument that the e-mails comprise a binding contract. The interpretation of a contract "is a question of law, not fact." *Cincinnati Gas & Elec. Co. v. F.E.R.C.*, 724 F.2d 550, 554 (6th Cir. 1984).

22

Federal common law rules require a court to give a contract its plain meaning when the contractual language is unambiguous, *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015); *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998), "in light of relevant industry-specific 'customs, practices, usages, and terminology,'" *M&G Polymers*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring) (quotation omitted). The intent of two contracting parties resides in that plain meaning, which is controlling and brings a court's analysis to an end. *See id.* at 938 (Ginsburg, J., concurring).

According to the plain language of the parties' e-mails, MetLife never waived its right to arbitrate Ms. Holt's claims; rather, the language clearly shows that MetLife intended the arbirability of Ms. Holt's claims to remain an issue for the judiciary's determination: "MetLife is agreeable to mediating Holt within 90 days *of the court's ruling on the arbitration issue*." [E-mail 2 at 1 (emphasis added)]. The Court cannot reasonably interpret this language, or any other language in the e-mails, as a waiver of MetLife's right to arbitrate or as a forum-selection provision. Either interpretation requires the Court to read language into the e-mails that simply is not there, and Ms. Holt, who has failed to identify the precise terms in the e-mails that she believes supports her interpretation, does little to empower her argument. *See* E.D. Tenn. L.R. 7.1(b) (instructing parties to include in their briefs "a concise statement of the factual . . . grounds which justify the ruling sought from the Court").

In the e-mails, MetLife merely expressed, in response to an inquiry from Ms. Holt, openness to mediation, which is neither a term nor a practice that is synonymous with the surrender of federal statutory rights, *see M&G Polymers*, 135 S. Ct. at 937–38 (Ginsburg,

23

J., concurring) (mentioning "industry-specific 'customs, practices, usages, and terminology,'" (quotation omitted))—much less in a setting that demands "the most compelling of fact patterns" to overcome the "strong presumption" against waiver, *JPD, Inc.*, 539 F.3d at 393. *See Ger. v. River Terminal Ry. Co.*, 477 F.2d 546, 547 (6th Cir. 1973) (stating that a party does not waive a right to arbitrate by "attempt[ing] to meet all issues raised in litigation between it and another party to the agreement" (citation omitted)); *see also Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 (5th Cir. 1991) ("Attempts at settlement . . . are not inconsistent with an inclination . . . [or] a right to arbitration." (citation omitted)); *Madrigal v. New Singular Wireless Servs., Inc.*, No. 09-CV-00033-OWW-SMS, 2009 WL 2513478, at *9 (E.D. Cal. Aug. 17, 2009) ("The argument that Defendants' agreement to mediate is an act inconsistent with their right to arbitrate is unpersuasive. It was *Plaintiffs* who initially proposed mediation . . . . Because Plaintiffs specifically proposed mediation in the first place, Plaintiffs cannot fault Defendants for agreeing to mediate instead of pursuing arbitration" (citations omitted)). MetLife, therefore, did not waive its right to arbitrate through "completely inconsistent" actions, *Johnson Assocs.*, 680 F.3d at 717, or agree to a forum-selection provision that requires it to litigate Ms. Holt's claims in state court only.

### D. The Validity and Enforceability of the Arbitration Provisions

An arbitration agreement may be invalid "for the same reasons . . . any contract may be invalid[]," *Fazio*, 340 F.3d at 393–94 (citation omitted); *see Volt*, 489 U.S. at 474 (stating that the FAA "was designed . . . [to] place [arbitration] agreements 'upon the same footing as other contracts'" (quotation omitted)), and therefore "ordinary state-law

24

principles that govern the formation of contracts" also govern arbitration agreements, *First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *but see Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87 (1996) (cautioning that state law applies only if it "arose to govern issues concerning the validity, irrevocability, and enforceability of contracts generally," rather than to govern arbitration agreements expressly (quotation omitted)). A party may therefore use general defenses to the validity or enforceability of a contract— like unconscionability, fraud, and duress—to invalidate an arbitration agreement. *Doctor's Assocs.*, 517 U.S. at 687.

To place the validity of an arbitration agreement in issue, however, a party must apply these defenses to the arbitration provision individually—that is, separately from the broader contract that, as a whole, contains the arbitration provision. *See Burden*, 267 F.3d at 490–92 (determining that allegations of fraud were unavailing because they dealt with the contract rather than the arbitration provision, which requires analysis independent from the contract); *Arnold v. Arnold Corp.-Printed Commc'ns for Bus.*, 920 F.2d 1269, 1278 (6th Cir. 1990) (stating that a party must allege a "well-founded claim of fraud in the inducement of the arbitration clause itself, *standing apart from the whole agreement*, that would provide grounds for the revocation of the agreement to arbitrate" (footnote omitted)). When a party attacks either the validity of a contract as a whole or certain terms of a contract, rather than the arbitration provision standing alone, an arbitrator and not a federal court is the proper adjudicator under the FAA. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010); *Prima Paint*, 388 U.S. at 403–04. Because Ms. Holt argues that arbitration provisions themselves, rather than the account applications as a whole, are

25

unenforceable contracts of adhesion, [*see* Resp't's Br. at 2; Woods Decl. ¶ 8], the Court can consider her argument.

### *1. The Arbitration Provision in Account Application 9324*

Under New York's general contract law, a contract of adhesion "contains terms that are unfair and nonnegotiable and arises from a disparity of bargaining power or oppressive tactics." *Molino v. Sagamore*, 963 N.Y.S.2d 355, 357 (N.Y. App. Div. 2013) (quotation omitted). The elements of a contract of adhesion are "(1) a necessity of life; (2) a contract for the excessive benefit of the offeror; (3) an economic or other advantage of the offeror; and (4) the offer of the proposed contract on a take it or leave it basis." *In re Vargas Realty Enters., Inc.*, 440 B.R. 224, 236 (N.Y.S.D. 2010) (quoting *Weidman v. Tomaselli*, 365 N.Y.S.2d 681, 686 (N.Y. Cty. Ct. 1975), *aff'd*, 386 N.Y.S.2d 276 (N.Y. App. Term 1975))).

"[T]he doctrine of inviolability of contract," however, "is not easily overcome." *Balaklaw v. Am. Bd. of Anesthesiology, Inc.*, 562 N.Y.S.2d 360, 363 (N.Y. Sup. Ct. 1990). An offeree's mere inequality in bargaining power will not create an unenforceable contract of adhesion; instead, an offerree must have "no realistic bargaining strength" and be unable to "obtain the desired services or goods elsewhere without consenting to the identical contract terms." *Sanchez v. Sirmons*, 467 N.Y.S.2d 757, 759 (N.Y. Sup. Ct. 1983); *see Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 572 (N.Y. App. Div. 1998) ("Although the parties clearly do not possess equal bargaining power, this factor alone does not invalidate the contract as one of adhesion."); *St. John's Episcopal Hosp. v. McAdoo*, 405 N.Y.S.2d 935, 936–37 (N.Y. Civ. Ct. 1978) (concluding that an unenforceable contract of

adhesion existed when a party was "powerless to do anything other than sign" a form contract so that his wife, who he believed was near death, could gain admission to the hospital). Although contracts of adhesion are typically standardized or form contracts, *see Brenner v. Gen. Plumbing Corp.*, No. 84237/2013, 2015 WL 423210, at *31 (N.Y. Civ. Ct. Jan. 23, 2015), these types of contracts are not per se unenforceable, *see Molino*, 963 N.Y.S.2d at 357 (stating that "a form agreement . . . is not automatically one of adhesion because '[s]uch claims are judged by whether the party seeking to enforce the contract has used high pressure tactics or deceptive language in the contract and whether there is inequality of bargaining power between the parties'" (quotation omitted)).

In *Brower v. Gateway, 2000, Inc.*, several customers bought computers from Gateway 2000, Inc. ("Gateway"), and with their purchases, Gateway agreed to provide them with around-the-clock technical support. 676 N.Y.S.2d at 570–71. After realizing, however, that "it was virtually impossible to get through to a technician," they sued Gateway under various theories of liability, including breach of contract and fraud. *Id.* Gateway moved to dismiss these claims based on an arbitration provision in the "Standard Terms and Conditions Agreement," which the customers received with their purchases. *Id.* In response, the customers argued that the arbitration provision was unenforceable because it was a contract of adhesion, a "'take it or leave it' proposition" with "no choice or negotiation on the part of the consumer." *Id.* at 572 (quotation omitted). The court held that the arbitration provision was not a contract of adhesion, reasoning that the customers could have "easily [bought] a competitor's product instead" or rejected Gateway's terms by returning the merchandise within thirty days—during which they also could have "[sought]

clarification of the terms of the agreement." *Id.* at 572–73.

Ms. Holt does not establish a genuine issue of material as to whether the arbitration provision in Account Application 9324 is an unenforceable contract of adhesion, failing to meet her burden as a party opposing a petition to compel arbitration. *See Green Tree*, 531 U.S. at 91; *Great Earth*, 288 F.3d at 889.[9] First, this arbitration provision does not concern a necessity of life, like food or shelter. *See Pacheco v. Heussler*, 56 A.D.2d 85, 90 (N.Y. App. Div. 1977) (stating that the element of "necessity of life" was present "because the subject of the contract . . . relates to a necessity, i.e., shelter"); *see also Loper v. N.Y.C. Police Dep't*, No. 90 Civ. 7546 (RWS), 1991 WL 135631, at *1–2 (N.Y.S.D. July 16, 1991) (accepting a definition of "necessities of life" that included food, shelter, clothing, medical care, and transportation). Instead, it is the parties' agreed-upon method for resolving disputes that relate to financial investments. *See Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (N.Y. 2014) (stating that a court must give contractual language its plain meaning); *see also Volt*, 489 U.S. at 474 (noting that "the interpretation of private contracts is ordinarily a question of state law").

Second, the record lacks evidence that Ms. Holt's consent to the arbitration provision arose from any disparity in bargaining power with MetLife or from high-pressure

---

[9] The lone evidence that Ms. Holt has submitted to the Court is the Declaration of Ronald W. Woods, which lacks factual assertions as to the enforceability of the arbitration provision. The majority of Mr. Woods' statements are a summary of the procedural posture of the state-court proceedings—hardly the type of grist that can formulate a material factual dispute in a process that mirrors summary judgment. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (instructing parties to "'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true" (internal quotation omitted)).

tactics on MetLife's part. Like the customers in *Brower*, Ms. Holt could have easily elected not to agree to the arbitration provision and to pursue a competitor's services. Indeed, in the section of the account application that incorporates the terms of the arbitration provision, Ms. Holt acknowledged that she had the chance to review the arbitration provision: "I have reviewed the [arbitration provision] . . . for my information and understanding." [Account Application 9324, doc. 1-1, at 2]. This language is analogous to the return policy that the customers received in *Brower* because it indicates that Ms. Holt had the opportunity to seek clarification of the arbitration provision's terms, whether from a lawyer or from MetLife, and to reject MetLife's services.[10] During her deposition, she affirmed that she in fact had this opportunity:

> Q: And you're not claiming, certainly, that Mr. Salyer ever forced you or your daughter to sign a document in your name, are you?
>
> A: Not to my knowledge.

[Holt Dep. at 12:7–10]. This testimony hardly supports a contention that MetLife exposed her to high-pressure tactics or that she had been "powerless to do anything other than sign" the arbitration provision, *St. John's Episcopal Hosp.*, 405 N.Y.S.2d at 936–37, and the record lacks a genuine issue of material fact that shows differently. The arbitration provision in Account Application 9324 is not an unenforceable contract of adhesion, therefore, but a valid arbitration provision.

---

[10] The return policy in *Brower* appears to have been part of the contract as a whole and not the arbitration provision specifically. In this case, however, the language that resembles a return policy is in the section of the account application that incorporates the arbitration provision by reference.

## 2. The Arbitration Provisions in Account Applications 3828, 9931, and 8578

As to the remaining arbitration provisions, the Court must engage in a separate and more circuitous analysis to determine whether they are valid because Ms. Holt did not personally sign them, and "[a]rbitration, all agree, 'is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 314 (2010) (Sotomayor, J., concurring in part and dissenting in part) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Even so, "it is well settled" that nonsignatories "may be bound by . . . an arbitration agreement executed by other parties under theories arising out of common law principles of contract and agency law." *Patteson v. McAdams Tax Advisory Grp., LLC*, No. 09-2085 Ma/P, 2010 WL 711161, at *4 n.6 (W.D. Tenn. Feb. 14, 2010); *see Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) (recognizing "[f]ive theories," one of which is "ordinary contract and agency principles," that may bind a nonsignatory to an arbitration agreement); *but see Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 780 (2d Cir. 1995) (chiding a district court because it ordered arbitration without requiring "a *full* showing of some accepted theory under agency or contract law" and therefore "dilut[ed] the protections afforded nonsignatories by the 'ordinary principles of contract and agency'").

MetLife does not dispute that Ms. Holt never signed Account Applications 3828, 9931, and 8578, but it nevertheless argues based on principles of agency law that she agreed to the arbitration provisions in each of these account applications. Specifically, MetLife maintains that Ms. Salyer acted as Ms. Holt's "authorized agent," who "[p]ursuant to [Ms.

30

Holt's] instructions . . . executed the account applications for Account Numbers XXXXX3838, XXXXX9931, XXXXX8578. [Pet. to Compel Arbitration ¶¶ 3, 6]. In most instances, however, "intrafamilial activity will not give rise to an agency relationship" under New York law, *Maurillo v. Park Slope U-Haul*, 606 N.Y.S.2d 243, 246 (N.Y. App. Div. 1993), though the fact that parties are related to each other does not necessarily preclude an agency relationship in every case, *see id.* at 247 (determining that a factual issue existed as to whether a son was his father's agent when the son had driven a U-Haul to move furniture at the father's request, at the father's direction, and for the father's benefit). An agency relationship requires the manifestation of "[1] consent of one person to allow another to act on his or her behalf and subject to his or her control, and [2] consent by the other so to act." *Dynas v. Nagowski*, 762 N.Y.S.2d 745, 748 (N.Y. App. Div. 2003) (quotation omitted). Although an agency relationship is largely a matter of mutual consent between the parties, *see Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 225 (N.Y.S.D. 2013), the principal must "maintain control over key aspects of the undertaking," *id.* (quoting *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003)).

The record is incontrovertible in that Ms. Holt authorized Ms. Salyer to sign Account Applications 3828, 9931, and 8578, establishing the element of consent on Ms. Holt's part:

> Q: When I spoke to your daughter, Lydia Salyer, a few weeks ago she had testified that there were some occasions where you instructed her to sign your name to MetLife account documents. Is that accurate?
>
> A: That is accurate.
>
> Q: And when you instructed her to sign your name for you, you understood

31

that you were authorizing Lydia to sign your name, correct?

A: I understood that.

Q: And so if your daughter, Lydia, signed your name to a document, like an account application, she did so with your express authorization, correct?

A: Yes, Sir.

Q: And how did you typically give her that authorization? Was it over the phone?

A: Yes it was.

. . . .

Q: And you don't have any reason to dispute that you gave her authority to sign th[ese] account application[s] on your behalf, do you?

A: No.

[Holt Dep. 5:6–22, 8:14–17]. The record also indicates that Ms. Holt had at least some

control over the "aspects of the undertaking," *Elbit Sys.*, 917 F. Supp. 2d at 225 (quotation

omitted), to the extent that she had license to instruct Mr. Salyer to show her the terms of

the arbitration provisions at any time:

Q: [Y]ou understood that when you signed these Account Applications or had Lydia sign them for you, that you were agreeing to be bound by the terms and conditions in the Account Application. Isn't that right?

A: Yes.

Q: And you chose not to read those terms, is that correct?

. . . .

A: They weren't presented to me to read.

Q: Well, you've testified that Mr. Salyer would have given them to you, had . . . you asked him for that correct?

A: Oh, yes.

Q: So you could have read them had you wanted to?

. . . .

A: Yes.

[Holt Dep. at 13:8–15, 13:18–24, 14:3]. The record is vague, however, as to whether Ms. Holt actually procured Ms. Salyer's consent to sign the arbitration provisions on her behalf—or for that matter, whether Ms. Salyer signed them at all. While Ms. Holt undeniably authorized her to sign them and the name Patsy A. Holt appears in cursive on them, no evidence shows that Ms. Salyer consented to do the signing or in fact did the signing.[11] The Court refuses to connect the dots without the necessary evidence, under a legal standard that does not permit it to make reasonable inferences in MetLife's favor. *Great Earth*, 288 F.3d at 889.

To be clear, the Court does not conclude that Ms. Holt has discharged her burden by establishing a genuine issue of material fact as to the enforceability of the arbitration provisions; rather the Court is unable to reach a decision on the issue of arbitrability because the record is factually insufficient. The Court now must conduct a "restricted inquiry into factual issues," *Moses H. Cone*, 460 U.S. at 22, to determine whether an agency relationship exists between Ms. Holt and Ms. Salyer. Although some courts have stated

---

[11] The record establishes only that Ms. Salyer agrees that the signatures on Applications 3828, 9931, and 8578 "*appear[]* to be in her handwriting." [Holt Dep. at 11:8–9 (emphasis added)]. Neither party has filed Ms. Salyer's deposition with the Court, so it is not available to the Court as a source of elucidation.

33

that this type of inquiry must include "limited discovery on the narrow issue concerning the validity" of an arbitration agreement, *see Guidotti*, 716 F.3d at 774 (quoting *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 511 (7th Cir. 2003)), the parties have already engaged in limited discovery on this issue at the state level. The Court sees no reason to order the parties to repeat the discovery that they have already completed, at added expense. *Cf. Tafflin v. Levitt*, 493 U.S. 455, 466 (1990) (noting that federal courts have a "consistent history of hospitable acceptance of concurrent jurisdiction" (quotation omitted)). In fact, if the Court were to order the parties to retrace their steps through discovery, it would only perpetuate the question of arbitrability—which has gone years without resolution—and potentially abdicate its responsibility to usher the parties "into arbitration as quickly . . . as possible." *Moses H. Cone*, 460 U.S. at 22. Instead, to ensure that the parties receive prompt relief from their dispute, the Court will order an "expeditious and summary hearing," which is consistent with the FAA. *Id.*

## IV. CONCLUSION

The arbitration provision in Account Application 9324 is valid and enforceable, and it requires Ms. Holt to arbitrate her claims under Account Application 9324—which are presently before the Circuit Court of Sullivan County. Based on the parties' submissions, however, the Court is unable to determine whether the other arbitration provisions—those in Account Applications 3828, 9931, and 8578—are valid and enforceable. The Court therefore orders as follows:

1. MetLife's Petition for Order to Compel Arbitration [doc. 1] is **GRANTED in part**, as to the arbitration provision in Account Application 9324 only.

34

2. Ms. Holt is **COMPELLED** to submit her claims under Account Application 9324 to arbitration, according to the terms of the arbitration provision. The parties shall promptly inform the Circuit Court of Sullivan County of this Court's Memorandum Opinion and Order.

3. The Court reserves ruling on whether the arbitration provisions in Account Applications 3828, 9931, and 8578 are enforceable against Ms. Holt, pending an evidentiary hearing. The parties are hereby **ORDERED** to appear before the Court in Knoxville, Tennessee, for an evidentiary hearing on Wednesday, August, 31, at 9:30 a.m.

4. Ms. Holt's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [doc. 4] is **DENIED**.

The Court will enter an order consistent with this opinion.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge