UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| METLIFE SECURITIES, INC., | ) |
| METLIFE INSURANCE COMPANY USA, | ) |
| METLIFE INVESTORS DISTRIBUTION | ) |
| COMPANY, METROPOLITAN LIFE | ) |
| INSURANCE COMPANY AND | ) |
| METLIFE, INC., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) No. 2:16-CV-32 |
| | ) |
| PATSY A. HOLT, | ) |
| | ) |
| Respondent. | ) |

## **MEMORANDUM OPINION**

This matter is before the Court on Petitioners' Petition for Order to Compel Arbitration [doc. 1] and the Hearing Transcript [doc. 48]. For the reasons herein, the Court will grant Petitioner's petition and compel arbitration of the remaining claims.

### I. BACKGROUND

Respondent Patsy A. Holt ("Ms. Holt") opened several Individual Retirement Accounts with Petitioners ("MetLife") in Greeneville, Tennessee, four of which are at issue in this action. [Pet. to Compel Arbitration, doc. 1, ¶¶ 1, 52; Holt Dep., doc. 1-9, at 8:4–8, 21–23, 9:17–20, 10:15–25, 11:1–3, 14:4–14; Woods Decl., doc. 4-1, ¶ 5].[1] Ms. Holt personally signed the account application for one of the four accounts—account number

---

[1] Pincites to the record refer to the electronic page numbers.

XXXXX9324. [Holt Dep. at 14:4–17]. At the suggestion of MetLife's authorized representative in charge of the accounts, Mark Salyer ("Mr. Mark Salyer"), Ms. Holt instructed her daughter, Lydia Salyer ("Ms. Salyer"), to sign the account applications for the three other accounts—account numbers XXXXX3828, XXXXX9931, and XXXXX8578—on her behalf. [*Id.* at 5:23–25, 6:1, 7:22–25, 8:1–25, 9:1–16, 10:15–25, 11:1–13].[2] Ms. Holt's name, Patsy A. Holt, appears in cursive in the signature block on those three account applications, [*see* Account Application 3828, doc. 1-2, at 2; Account Application 9931, doc. 1-3, at 2; Account Application 8578, doc. 1-4, at 2], but Ms. Holt did not view or read them, [Holt Dep. at 11:14–18]. In total, Ms. Holt claims to have invested more than $1,900,000 in the accounts. [Second Am. Compl., doc. 1-8, ¶ 19].

According to Ms. Holt, Mr. Mark Salyer went on to misappropriate her funds, which are now almost entirely gone. [*Id.* ¶¶ 28, 30]. As a result, she sued Mr. Mark Salyer and MetLife in the Circuit Court of Sullivan County, Tennessee, for breach of contract, conversion, failure to supervise, fraud, and negligence, alleging that MetLife is responsible for Mr. Mark Salyer's misconduct. [*Id.* ¶¶ 25–35]. In response, MetLife filed in the state court a motion to compel arbitration, arguing that Ms. Holt has to arbitrate her claims because the four account applications contain arbitration provisions. [*See* Pet. to Compel Arbitration ¶ 9; State Court Order, doc. 7-2, ¶ 2]. In each account application, the arbitration provision reads:

> MetLife . . . and the purchaser of the shares, who is the signatory below . . . agree that any controversy . . . arising out of or relating to any

---

[2] MetLife alleges that Mr. Mark Salyer "was Holt's son-in-law at the time." [Pet. to Compel Arbitration ¶ 1].

> transactions between [them] shall be determined by arbitration. . . . This agreement and any arbitration hereunder shall be governed and construed in accordance with the laws of the State of New York . . . .

[Account Applications, doc. nos. 1-1, 1-2, 1-3, 1-4, at 3]. The court ruled that Ms. Holt's claims related to account number XXXXX9324 are subject to arbitration but reserved ruling on the arbitrability of the other claims until it could decide whether to allow discovery. [Woods Decl. ¶ 5]. Mr. Mark Salyer, however, then filed for bankruptcy, and the court stayed the case for roughly three years. [Pet. to Compel Arbitration ¶ 9]. When the case resumed after the bankruptcy proceedings, the court permitted Ms. Holt to file a revised second amended complaint so she could allege that the arbitration provisions are unenforceable contracts of adhesion. [Woods Decl. ¶ 8; *see* Second Am. Compl. ¶ 22].

Around this time, MetLife renewed its motion to compel arbitration, prompting the state court to allow discovery on whether all four arbitration provisions are unenforceable contracts of adhesion. [State Court Order at 2]. The state court reserved ruling on this issue until it could conduct an evidentiary hearing, [*id.*], and the parties proceeded to conduct some discovery, which included depositions, interrogatories, and requests for production, [Woods Decl. ¶ 12]. MetLife, however, then brought this action, petitioning this Court to compel Ms. Holt to arbitrate her claims under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–14. [Pet. to Compel Arbitration at 5–16]. Ms. Holt filed a Response in Opposition to MetLife's Petition [doc. 6], which she titled as a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." [Resp't's Resp. in Opposition at 1]. Construing Ms. Holt's response as a motion for summary judgment, the Court granted MetLife's Petition to Compel Arbitration in part, requiring Ms. Holt to arbitrate her claims

3

under Account Application 9324. [*See* Mem. Op., doc. 8, at 26–29, 35]. The Court ordered an evidentiary hearing to determine whether Ms. Holt is bound to the arbitration provisions in Account Applications 3828, 9931, and 8578, which she did not sign but instructed Ms. Salyer to sign on her behalf. [*See id.* at 30–35]. Having now concluded the evidentiary hearing, the Court is prepared to rule on the enforceability of the remaining arbitration provisions.

## II. LEGAL STANDARD

"When asked by a party to compel arbitration under a contract, a federal court must determine whether the parties have agreed to arbitrate the dispute at issue." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citation omitted). If a court concludes that an arbitration agreement is valid, it must order the parties to arbitration. 9 U.S.C. § 4; *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). If it determines, however, that the validity of the arbitration agreement is "in issue," 9 U.S.C. § 4, the parties must then proceed to a trial to resolve their dispute, *Great Earth*, 288 F.3d at 889. The burden of showing that an arbitration agreement is in issue rests with the party opposing arbitration, and a trial is necessary only if this nonmoving party can establish that a genuine issue of material fact exists as to the arbitration agreement's validity. *Id.* at 889; *see Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). "The required showing mirrors that required to withstand summary judgment in a civil suit." *Great Earth*, 288 F.3d at 889 (citing *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 129–30 (2d Cir. 1997), *cert. denied*, 522 U.S. 948 (1997)). The inquiry, therefore, that a court should make is whether the evidence "is such that a reasonable finder of fact could conclude that no valid agreement

4

to arbitrate exists." *Id.* (citation omitted). When making this inquiry, it must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party—that is, the party opposing arbitration. *Id.*

### III. ANALYSIS

As the Court made clear to the parties through its previous orders, the evidentiary hearing was a limited factual inquiry into a single issue: whether Ms. Salyer bound her mother to the arbitration provisions in the account applications through an agency relationship. [*See* Mem. Op. at 33–34]. Under New York law, an agency relationship requires the manifestation of "[1] consent of one person to allow another to act on his or her behalf and subject to his or her control, and [2] consent by the other so to act." *Dynas v. Nagowski*, 762 N.Y.S.2d 745, 748 (N.Y. App. Div. 2003) (quotation omitted). The Court reminds the parties that it has already determined that the record does not contain a genuine issue of material fact as to the first element. [Mem. Op. at 31–33]. Ms. Holt previously testified that she instructed Ms. Salyer to sign "MetLife account documents" on her behalf. [Holt Dep., doc. 1-9, at 5:6–11]. Ms. Holt also previously testified that she does not dispute that these documents included the account applications at issue:

> Q: And you don't have any reason to dispute that you gave her authority to sign *this* application on your behalf, do you?
>
> A: No.

[*Id.* at 8:14–17 (emphasis added); *see id.* at 9:13–16, 11:9–13 (providing the same testimony from Ms. Holt as to the other account applications)].

During the evidentiary hearing, Ms. Salyer testified that she consented to act on her mother's behalf, satisfying the second element of an agency relationship:

> Q: [D]id you agree to accept . . . your mother's request for you to sign certain . . . MetLife documents?
>
> A: Yes, I did.
>
> Q: Okay. And when you signed . . . your mother's name to certain MetLife documents, were you doing so pursuant to the authority that your mother gave you? Did you sign them—did you sign your mother's name because your mother asked you to?
>
> A: Yes.

[Hearing Tr. 40:19–25, 41:1–2]. The record is therefore now clear that Ms. Salyer agreed to act on her mother's behalf, and Ms. Holt does not point to evidence that would allow a reasonable juror to reach a different conclusion. Because an agent, however, is not only a party who consents to act but also a party "who *acts* on behalf of the principal," the Court must consider whether Ms. Holt has established a genuine issue of material fact as to whether Ms. Salyer actually did sign the account applications. *Maurillo v. Park Slope U-Haul*, 606 N.Y.S.2d 243, 246 (N.Y. App. Div. 1993) (emphasis added).

During the evidentiary hearing, Ms. Salyer testified that she signed at least "a few" documents on her mother's behalf. [Hearing Tr. at 41:13]. The remainder of her testimony, however, is somewhat equivocal. She could not recall with certainty whether she signed the three specific account applications at issue. After reviewing the signatures on each of the account application while on the stand, she said: "Looks like it could possibly be my handwriting, yes."; "It does look to be similar to my signature, yes."; and "It looks like it could be my signature, yes." [*Id.* at 44:7, 10, 23]. In other words, Ms. Salyer testified that

6

while she did in fact sign "MetLife documents" on her mother's behalf, she could not remember whether those documents included the account applications at issue.

> Q: So to say with . . . . any certainty whether those three account applications were—that you signed—you signed your mother's name to them, you are not completely sure, are you?
>
> A: I don't remember.

[*Id.* at 50:2–7]. The question now facing the Court is whether, in the context of a petition to compel arbitration, Ms. Salyer's testimony is sufficient to create a *genuine* issue of *material* fact as to whether Ms. Salyer acted for her mother. Ms. Holt argues that Ms. Salyer's testimony does create a genuine issue of material fact as to whether Ms. Salyer acted on her behalf: "Lydia Salyer can[not] say . . . that the account applications that were presented . . . to [her] . . . were the account applications for these particular accounts . . . or not . . . and that certainly creates a genuine issue of material fact." [*Id.* at 80:19–23].

The Court reiterates that Ms. Holt, as the party opposing arbitration, bears the burden of raising a genuine issue of material fact as to the enforceability of the arbitration provisions, *Green Tree*, 531 U.S. at 91; *Great Earth*, 288 F.3d at 889—a burden that is in keeping with "the strong federal policy in favor of arbitration," *Stout*, 228 F.3d at 714 (citations omitted). Again, Ms. Holt's burden "mirrors that required to *withstand* summary judgment," *Great Earth*, 288 F.3d at 889 (emphasis added) (citation omitted), so in other words, it parallels the burden of a nonmoving party on a motion for summary judgment. To discharge this burden and avert summary judgment, a nonmoving party must do more than identify just any factual dispute in the record but must identify a *genuine* issue of

7

*material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3] Also, in meeting this burden, a nonmoving party cannot "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted); *see Reid v. Thetford Twp.*, 377 F. Supp. 2d 621, 624 (E.D. Mich. 2005) ("[T]he nonmoving party must do more than raise *some doubt* as to the existence of a fact[.]" (emphasis added) (citation omitted)). In sum, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citation and citations omitted).

The Court cannot agree with Ms. Holt's contention that Ms. Salyer's testimony at the evidentiary hearing creates a genuine issue of material fact. Because Ms. Salyer's testimony is non-committal—consisting of her inability to recall whether the signatures on the account applications that resemble her own are in fact her own—it is insufficient to raise a genuine issue of material fact. *See Smith v. LVNV Funding, LLC*, No. 2:11-CV-356, 2014 WL 4441195, at *1 n.1 (E.D. Tenn. Sept. 9, 2014) (noting that "testimony that the plaintiff does not remember" whether an event took place "does not amount to [a] sufficient denial[] to create a genuine issue of material fact"); *Linao v. GCR Tire Ctrs.*, No. 2:09-CV-134-RWS, 2010 WL 4683508, at *5 (N.D. Ga. Nov. 12, 2010) ("[W]here the only evidence

---

[3] A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *Anderson*, 477 U.S. at 248, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party," *id.*

8

negating the existence of an event is a witness's failure to remember that event, other courts have declined to find a genuine issue of fact for summary judgment purposes."); *McBride v. Vill. of Michiana*, No. 4:92-CV-155, 1998 WL 276139, at *4 (W.D. Mich. Apr. 2, 1998) (concluding that a witness's inability to "remember several important details" about a phone call "failed to create an issue of fact"); *Chandler v. James*, 985 F. Supp. 1094, 1100 (M.D. Ala. 1997) ("[A] witness who states that he cannot remember whether or not an event alleged to have happened by the moving party actually took place does not help the nonmoving party to meet its burden. The nonmoving party must come up with evidence that negates the version of events alleged by the moving party—an acknowledgement that the event may have occurred, but the witness cannot remember, falls short."); *Carter v. Newsday, Inc.*, 528 F. Supp. 1187, 1191 (E.D.N.Y. 1981) ("Nor may the nonmovant rely on deposition statements to the effect that the deponent 'does not remember' a particular fact, as a means of putting that fact in issue."); *see also Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002) (determining that a party opposing arbitration did not meet her burden of establishing a genuine issue of material fact by avowing that she did "not remember receiving or seeing" the brochure containing the arbitration provision).

Ms. Salyer, during her testimony, never *disputed* or *denied* that the signatures on the account applications are her own. At most, her inability to recall whether she signed them may create "some doubt" as to whether she actually acted for her mother, *Reid*, 377 F. Supp. 2d at 624, but again, a nonmoving party cannot stave off summary judgment by raising merely some doubt about a fact's existence or an event's occurrence, *Matsushita*, 45 U.S. at 586; *Reid*, 377 F. Supp. 2d at 624. In addition, the FAA obligates the Court to

9

resolve "any doubts regarding arbitrability . . . in favor of arbitration." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). Simply, Ms. Holt had a burden to produce evidence that would enable a reasonable juror to determine that Ms. Salyer did not bind her to the arbitration provisions through an agency relationship. Ms. Holt, however, produced no such evidence, neither before nor during the evidentiary hearing.

Again, Ms. Holt previously testified that she consented to allow Ms. Salyer to sign the account applications. [Holt Dep. at 8:14–17, 9:13–16, 11:9–13]. While testifying during the evidentiary hearing, Ms. Salyer confirmed that she agreed to act on her mother's behalf, [Hearing Tr. at 40:19–25, 41:1–2], acknowledged that she signed at least "a few" documents, [*id.* at 41:13], conceded that the documents that she signed were in fact account applications, [*id.* at 47:8, 10], stated that the signatures look like they are in her handwriting, [*id.* at 44:7, 10, 23], and even could recall where she was when she signed them, [*id.* at 47:8–10]. Against the backdrop of this evidence, Ms. Salyer's inability to remember with certainty whether the signatures on the account applications belong to her is not sufficient or probative evidence of a genuine factual dispute. *Cf. Torjagbo v. United States*, 285 F. App'x 615, 619 (11th Cir. 2008) (determining that, in light of the record evidence as a whole, the plaintiff's failure to remember signing a covenant not to sue did not create a genuine issue of fact as the authenticity of his signature).

During the evidentiary hearing, Ms. Holt also suggested that Mr. Mark Salyer, who is now serving time in federal prison after defrauding his clients while he was a securities broker with MetLife, forged her signatures on the account applications. [Hearing Tr. at

10

81:14–18 (intimating that Ms. Holt's signatures might have been "electronically counterfeited by Mark Salyer or somebody else"); see U.S. Attorney's Office for the E. Dist. of Tenn., *Kingsport Securities Broker Sentenced to Nine Years in Federal Prison for Fraud and Money Laundering* (Apr. 23, 2012), https://www.justice.gov/archive/usao/tne/news/2012/April/042312%20Salyers%20Sentencing%20Money%20Laudering%20and%20Fraud.html (noting that Mr. Mark Salyer had "forged clients' names to documents"). The record, however, is devoid of evidence that would allow a reasonable juror to find that Mr. Mark Salyer forged the signatures on the account applications.[4] The testimony of MetLife's expert Dr. Larry Miller ("Dr. Miller") does not provide this type of evidence, despite Ms. Holt's assertion otherwise during the evidentiary hearing. [*See* Hearing Tr. at 81:15–18 ("[O]ne of many things that creates a genuine issue of material fact . . . [is] Dr. Miller's testimony that he can't say that those signatures were [not] electronically counterfeited by Mark Salyer[.]").

As MetLife's expert, Dr. Miller limited his review and analysis to the issue of whether Ms. Salyer herself signed the account applications. [*See* Dr. Miller Decl., Ex. 11, at 1–2]. He studied samples of Ms. Salyer's handwriting to determine whether they matched the handwriting on the account applications, [*id.*], and at the evidentiary hearing, he concluded that they were a match, [Hearing Tr. at 64:8–11].[5] On cross examination, he testified that he did not have samples of Mr. Mark Salyer's handwriting to review, [*id.* at

---

[4] Ms. Salyer in fact testified that she never saw her husband sign her mother's name to a document. [Hearing Tr. at 47:4–6].

[5] Ms. Holt did not call an expert of her own to rebut this testimony.

11

73:5–11], and that he did not consider whether Mr. Mark Salyer forged the signatures on the account applications, [*id.* at 73:12–14, 75:24–25, 76:1–4]. Not once during his testimony did he state that Mr. Mark Salyer forged the signatures or even opine as to likelihood of that occurrence.

> Q: So since you have not made that evaluation, you're unable to say if Mark—if that's in Mark Salyer's handwriting, are you?
>
> A: I could not say that.

[Hearing Tr. at 73:12–14].

This testimony is hardly positive evidence establishing that Mr. Mark Salyer forged the signatures, and Ms. Holt never called an expert of her own to produce testimony that the signatures were forgeries. Although Dr. Miller went on to acknowledge the signatures might conceivably be "a cut and paste," [*id.* at 75:23], he also reiterated his testimony that he was simply unable to say, based on the scope of his review, whether the signatures are in Mr. Mark Salyer's handwriting, [*id.* at 75:24–25, 76:1–4]. At most, Dr. Miller recognized the mere possibility that Mr. Mark Salyer could have signed Ms. Holt's name to the account applications, without mentioning how significant or likely that possibility might be. "Evidence suggesting a mere possibility," however, "is not enough to get past the summary judgment stage." *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986). Because Ms. Holt elicited no testimony from Dr. Miller that raised more than the possibility that the signatures belong to Mr. Mark Salyer, she has not produced evidence of a genuine factual dispute, failing to satisfy her burden.

12

## IV. CONCLUSION

Ms. Holt has failed to identify a genuine and material factual dispute as to whether her daughter, acting as her agent, bound her to the arbitration provisions in the three remaining account applications. Falling short of placing the enforceability or validity of those provisions in issue, she has not met her burden as the party opposing arbitration and is not entitled to a trial to determine arbitrability. The Court must compel arbitration of the remaining claims. Having ruled that arbitration is proper under the FAA, the Court elects to dismiss rather than simply stay this litigation, *see Ozormoor v. T-Mobile USA, Inc.*, 354 F. App'x 972, 975 (6th Cir. 2009), and the Court orders as follows:

1. Ms. Holt is **COMPELLED** to submit her claims under Account Applications 3828, 9931, and 8578 to arbitration, according to the terms of the arbitration provisions. The parties shall promptly inform the Circuit Court of Sullivan County of this Court's Memorandum Opinion and Order.

2. This action is hereby **DISMISSED**.

The Court will enter an order consistent with this opinion.

       **IT IS SO ORDERED.**

                                        ENTER:

                                        s/ Leon Jordan
                                        United States District Judge